UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| GREGORY CLAYBORN, et al., | Case No. 17-cv-06894-LB |
| Plaintiffs, | **ORDER GRANTING MOTION TO DISMISS** |
| v. | |
| TWITTER, INC., et al., | Re: ECF No. 50 |
| Defendants. | |
| HANAN MEGALLA, et al., | Case No. 18-cv-00543-LB |
| Plaintiffs, | **ORDER GRANTING MOTION TO DISMISS** |
| v. | |
| TWITTER, INC., et al., | Re: ECF No. 1 |
| Defendants. | |

# INTRODUCTION

On December 2, 2015, Syed Farook and Tashfeen Malik killed 14 people and injured 22 others in San Bernardino, California. The *Megalla* plaintiffs were injured in the attack, and the *Clayborn*

plaintiffs are the surviving family members of those who died in the attack.[1] The parties stipulated to the consolidation of the cases on December 6, 2018.[2]

The plaintiffs allege that "[t]he terror attacks in this case were carried out by ISIS [the Islamic State of Iraq and Syria], a terrorist organization for years closely affiliated with *al-Qaeda* . . . ."[3] The plaintiffs sued Twitter, Google, and Facebook — all operators of online social-media platforms — on the ground that by allowing "foreign terrorist organizations" to use their platforms, they aided and abetted international terrorism and provided material support to international terrorists, in violation of several civil-remedies provisions in the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a) and (d), 2339A, 2339B, and 2339C, and resulting in negligent infliction of emotional distress and wrongful death, in violation of state law.[4]

The defendants moved to dismiss on the following grounds, among others: (1) the plaintiffs' direct liability claims fail because they do not plausibly allege proximate cause; and (2) the plaintiffs' secondary liability claims fail because they do not plausibly allege that ISIS committed, planned, or authorized the San Bernardino shootings or that the defendants knowingly aided or abetted the shootings or conspired with anyone involved in the attack.[5]

---

[1] Clayborn First Amended Complaint ("FAC") – ECF No. 50 at 5 (¶ 12), 9–10 (¶¶ 33–39); Megalla Compl. – ECF No. 1 at 5–6 (¶¶ 9–12). Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Initially, the cases were related, and then the parties agreed to consolidate them. Order – ECF No. 23; Minute Entry – ECF No. 67. As discussed at the December 6, 2018 hearing, the result of the consolidation is that the *Megalla* plaintiffs (who did not amend their initial complaint) are pulled into the *Clayborn* case (where the plaintiffs amended their complaint). Because the *Clayborn* amended complaint represents the plaintiffs' best effort at pleading claims, the consolidation obviates the need for the *Megalla* plaintiffs to amend their complaint to conform to the *Clayborn* amendment. Based on the consolidation, this order cites primarily to the *Clayborn* complaint but cites sometimes to the *Megalla* complaint for plaintiff-specific allegations. Except for citations to the *Megalla* complaint, No. 18-cv-00543-LB – ECF No. 1, citations in this order are to the briefs and docket in *Clayborn*, No. 17-cv-06894-LB.

[3] FAC – ECF No. 50 at 4 (¶ 8).

[4] *Id.* at 8–9 (¶ 29), 10 (¶¶ 40–42), 119–127 (¶¶ 587–635).

[5] Mot. – ECF No. 53 at 13–26. The defendants filed a consolidated motion and reply, and the plaintiffs filed a consolidated opposition. *Id.*; Opp. – ECF No. 59; Reply – ECF No. 61; *see* Order – ECF No. 44 (authorizing consolidated briefing); *see* Megalla Opp. – ECF No. 60 at 2 (the opposition in *Clayborn* "should stand for" the opposition in *Megalla*).

The court grants the defendants' motion to dismiss and dismisses the complaints with prejudice.

## STATEMENT[6]

### 1. The San Bernardino Attack and the Aftermath of the Attack

"On December 2, 2015, radicalized ISIS supporters Syed Rizwan Farook and Tashfeen Malik" — dressed in black outfits and face coverings, armed with AR-15 semi-automatic rifles and a .9mm semi-automatic handgun, and carrying "assembled pipe bombs" — "stormed the Inland Regional Center in San Bernardino, California."[7] "Farook's former co-workers [were] assembled for a scheduled . . . training session" and a holiday party.[8] Farook and Malik fired more than 100 bullets, "indiscriminately spraying bullets into the crowd."[9] They killed 14 people and injured 22 others.[10] "During the shooting massacre, terrorist Tashfeen Malik declared on Facebook her allegiance and pledge of loyalty to ISIS leader Abu Bakr al-Baghdadi."[11] "After their massacre, Farook and Malik fled the scene in a rented SUV" and — after "leading the police on a chase" — "were subsequently killed in a shootout with the police."[12] A search of their home "uncovered what the[] [Federal Bureau of Investigation ("FBI")] described as 'pipe bombs, bomb making materials, and thousands of rounds of ammunition, along with several more guns.'"[13] At the crime scene, the FBI SWAT [Special Weapons and Tactics] agents found that "the terrorists had evidently assembled and left a 'suspicious package' at the scene, which contained explosive

---

[6] The fact allegations in this statement are from the Clayborn first amended complaint. FAC – ECF No. 50.

[7] *Id.* at 83 (¶¶ 424, 426).

[8] *Id.* (¶ 425).

[9] *Id.* (¶ 427).

[10] *Id.* at 75 (¶ 387), 84 (¶ 431).

[11] *Id.* at 83 (¶ 428).

[12] *Id.* at 83–84 (¶¶ 429, 432).

[13] *Id.* at 85–86 (¶ 441).

devices that miraculously failed to detonate and later were safely detonated by the bomb squad."[14] The U.S. Department of Justice ("DOJ") report said that the package "was likely intended to be detonated upon the arrival of the first responders[,] who would be giving aid to the wounded — a frequent, well documented practice in international terrorism incidents."[15] "FBI and DOJ investigators indicated that terrorists Farook and Malik left a remote-controlled toy car strapped with 3 rudimentary explosive devices at the scene of the crime. The remote was found with Farook and Malik upon their deaths."[16] "FBI investigators opined that the explosive devices, along with the remote control, w[ere] likely intended to be detonated against the first responders arriving to provide medical help to terrorist victims. This terrorist tactic has been outlined in Al Qaeda's *Inspire Magazine*, as well as ISIS's *Dabiq Magazine*, where in the international terrorist organizations have provided 'tips' and instructions to be utilized in preparation of such explosive devices similar to those found at the scene of the San Bernardino Attack."[17]

"Two days after the attack [on December 4, 2015], ISIS issued a statement claiming direct responsibility for the attacks, . . . declaring on the al-Baya Radio station, 'Two followers of Islamic State attacked several days ago a center in San Bernardino in California, we pray to God to accept them as Martyrs.'"[18]

On December 9, 2015, in Senate Judiciary Committee testimony, the FBI director James Comey said — based on the FBI's investigation — that Farook and Malik were "'consuming poison on the internet'" and "had become radicalized to jihadism and to martyrdom via social media platforms available to them."[19] Director Comey characterized Farook and Malik as "'homegrown violent extremists, inspired by foreign terrorist organizations,'" and he said, "'When you invest in a narrative, a poisonous narrative that resonates with troubled souls, with unmoored

---

[14] *Id.* at 86 (¶ 445).
[15] *Id.* at 86–87 (¶ 446).
[16] *Id.* at 87 (¶ 447).
[17] *Id.* (¶ 448).
[18] *Id.* at 84 (¶ 434);
[19] *Id.* (¶ 435).

people, and you do it in a slick way through social media, you buzz in their pocket 24 hours a day, saying come or kill, come or kill, that has an impact.'"[20]

"The FBI confirmed evidence that Farook had face to face meetings a few years prior to the attack with five people the Bureau investigated and labeled as having 'links to terrorism.'"[21] Also, Farook and Malik "planned the attack for at least a year," and "in the years leading up to the San Bernardino attack, Farook and Malik discussed 'the jihad and martyrdom' while they dated online."[22] "Malik pledged allegiance to the leader of ISIS just before she and her husband carried out the San Bernardino massacre. The final post on Malik's Facebook page before the massacre used the word 'we' in the pledged allegiance to ISIS, an indication, a U.S. official said, that it was a statement on behalf of both killers."[23]

### 2. Additional Allegations About ISIS's Involvement in the Attack

ISIS is a terrorist organization and is a "designated Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189 . . . ."[24] "On December 2, 2015, ISIS carried out a horrific terror attack in San Bernardino, California, murdering 14 people . . . and injuring 22 more. . . ."[25] The attack was intended to intimidate the civilian populations of the United States and other countries.[26] "[A] major component of the San Bernardino Attack was the messaging disseminated by ISIS prior to, during, and after the events, in which ISIS stated its reasons for committing the terrorist attack against these countries' civilians."[27] The attack "involved extensive planning, recruiting, organizing, training, preparation,

---

[20] *Id.* at 85 (¶¶ 436–437).

[21] *Id.* (¶ 440).

[22] *Id.* at 77 (¶¶ 399–400); *see id.* at 77–78 (¶¶ 401–402) (online dialogue between Malik and Farook involving frequent communications about jihad and martyrdom).

[23] *Id.* at 78 (¶ 403.)

[24] *Id.* at 4 (¶ 8), 36 (¶¶ 161–165); *see id.* at 11–36 (¶¶ 46–160).

[25] *Id.* at 75 (¶ 387).

[26] *Id.* at 75–76 (¶ 388).

[27] *Id.* at 76 (¶ 389).

coordination, and funding."[28] That process involved the use of the defendants' platforms — before and after the attack — "to intensify the fear and intimidation that ISIS intended to inflict by this mass casualty attack."[29] ISIS used the defendants' platforms to "facilitate and accomplish all of those things."[30] More specifically, it used social media to carry out its terrorist activities, including calling for attacks on "the West."[31] Via social media, it urges its supporters to attack countries such as the United States (and others).[32]

"Farook and Malik were radicalized by ISIS's use of social media. This was the stated goal of ISIS. Farook and Malik then carried out the deadly San Bernardino Attack. Conducting terrorist attacks via radicalized individuals is a stated goal of ISIS."[33] "Farook and Malik were ISIS operatives," and the San Bernardino attack "was direct action by ISIS."[34] "But for ISIS's postings using Defendants' social media platforms, Farook and Malik would not have engaged in ISIS's San Bernardino Attack."[35]

### 3. ISIS's Use of Social Media and the Defendants' Profits from and Support of ISIS

ISIS "has exploited social media, most notoriously Twitter, to send its propaganda and messaging out to the world and to draw in people vulnerable to radicalization."[36] "[U]ntil recently, ISIS maintained an official account on Twitter unfettered."[37] According to FBI Director James Comey, "ISIS has perfected its use of Defendants' sites to inspire small-scale individual attacks,

---

[28] *Id.* (¶ 390).
[29] *Id.* (¶ 391).
[30] *Id.* (¶ 392).
[31] *Id.* at 76–77 (¶¶ 393–398).
[32] *Id.* at 78–83 (¶¶ 404–423).
[33] *Id.* at 117 (¶ 569).
[34] *Id.* (¶ 570).
[35] *Id.* (¶ 574).
[36] *Id.* at 5 (¶ 13).
[37] *Id.* at 5–6 (¶ 14); *see id.* at 7 (¶ 17) (as of December 2014, ISIS had an estimated 70,000 Twitter accounts, at least 79 were official, and it posted at least 90 tweets every minute).

'to crowdsource terrorism' and 'to sell murder.'"[38] The complaint recounts ISIS's extensive use of social media to disseminate propaganda, recruit members, connect its members, raise funds, plan and carry out attacks, publicize its exploits, and strike fear in others.[39] This use includes messages directed toward the United States, France, and their allies.[40]

"For years, ISIS and its affiliated media production and distribution networks operated and used official Twitter, YouTube [owned by Google], and Facebook accounts with little or no interference."[41] Despite media coverage, complaints, legal warnings, petitions, congressional warnings, and other attention, they continued to do so before the San Bernardino attacks.[42] The defendants "knowingly provided material support and resources to ISIS in the form of Twitter, Facebook, and Google's YouTube platforms, as well as by making personnel available to ISIS."[43] ISIS used the defendants' platforms to carry out terrorist activities, including the San Bernardino terrorist attacks.[44]

The defendants profit from ISIS by placing ads on ISIS's postings, and at least Google shares the ad revenue with ISIS.[45] The defendants "incorporate ISIS's postings to create unique content by combining the ISIS postings with advertisements selected by the Defendants based on ISIS's postings and the viewer looking at the postings and the advertisements."[46]

Despite knowing that ISIS is a Foreign Terrorist Organization, the defendants provide their services to ISIS and its members and supporters.[47] This allows ISIS recruits and members to

---

[38] *Id.* at 5 (¶ 13).

[39] *Id.* at 5–9 (¶¶ 12–32), 36–45 (¶¶ 166–212).

[40] *Id.* at 78–83 (¶¶ 404–423).

[41] *Id.* at 8 (¶ 26).

[42] *Id.*

[43] *Id.* (¶ 27).

[44] *Id.* (¶ 28).

[45] *Id.* at 9 (¶ 31); *id.* at 95–102 (¶¶ 485–517).

[46] *Id.* (¶ 32); *see also id.* at 91 (¶¶ 457–459).

[47] *Id.* at 92 (¶ 464).

connect, "thus providing personnel to ISIS itself."[48] Despite complaints, the defendants determined "at various times" that ISIS's use of the platforms did not violate their policies and permitted ISIS's accounts to remain active (or removed only a portion of ISIS content).[49] Even when they suspended accounts, they did not ensure that ISIS would not reestablish its accounts.[50] They could deny services to ISIS but refused to do so.[51]

### 4. Allegations That the Defendants are "Information Content Providers"

The defendants create the configuration for their sites that contain postings and advertisements.[52] "In other words, a viewer does not simply see a posting . . . [or] just an advertisement. Defendants create a composite page of content from multiple sources."[53] Through their proprietary algorithms, the defendants create a page by selecting an advertisement to match with the page's content.[54] "Thus there is a content triangle matching the postings, advertisements, and viewers."[55] "Though Defendants have not created the posting . . . or the advertisement, . . . [they] have created new unique content by choosing which advertisement to combine with the posting with knowledge about the viewer."[56]

The defendants also recommend content to users based on the content and what they know about the viewer.[57] For example, Google has recommended ISIS videos to users.[58]

---

[48] *Id.* (¶ 467).
[49] *Id.* at 93 (¶ 469).
[50] *Id.* (¶ 470); *see id.* at 93–95 (¶¶ 471–484).
[51] *Id.* at 106–116 (¶¶ 538–565).
[52] *Id.* at 102 (¶ 518).
[53] *Id.*
[54] *Id.* at 103 (¶ 519).
[55] *Id.*
[56] *Id.* (¶ 521).
[57] *Id.* at 103–104 (¶ 523).
[58] *Id.*

By targeting advertisements based on viewers and content, the defendants are not "simply passing through the content of third parties; rather, Defendants have incorporated ISIS postings along with advertisements matched to the viewer to create new content for which Defendants earn revenue, and thus providing material support to ISIS."[59]

### 5. Allegations That the Defendants' Platforms Have Unique Computer Architecture

The defendants' platforms and other services are provided to users via the defendants' unique computer architecture.[60] A user posts content, and the defendants' computer servers receive it, distribute it to the user's social network, post it to newsfeeds (or the equivalent), host it, store it, and allow its redistribution in various ways (such as posts, messages, links, sharing, and the like).[61] The defendants' algorithms operate as a matchmaker between like users by suggesting similar content to users based on their interests.[62] By providing their platforms and other services to ISIS, the defendants "are providing to ISIS use of unique computer architecture, computer servers, storage and communication equipment, highly[ ]developed and sophisticated algorithms, and services that facilitate ISIS's ability to reach and engage audiences it could not otherwise reach as effectively."[63] The platforms' "usefulness to ISIS is not merely about content; ISIS uses Twitter, Facebook, and YouTube as tools to connect with others and promote its terrorist activity," creating a virtual jihadist community.[64]

### 6. The Claims

The complaint has seven claims: (1) aiding and abetting international terrorism, in violation of 18 U.S.C. § 2333(a) and (d); (2) conspiracy to aid and abet international terrorism, in violation of

---

[59] *Id.* at 104 (¶ 525).
[60] *Id.* (¶ 526).
[61] *Id.* at 105 (¶¶ 527–533).
[62] *Id.* at 105–106 (¶¶ 533–534).
[63] *Id.* at 106 (¶ 535).
[64] *Id.* (¶¶ 536–537).

ORDER – No. 17-cv-06894-LB; 18-CV-00543-LB        9

18 U.S.C. § 2333(a) and (d); (3) provision of material support to terrorists, in violation of 18 U.S.C. §§ 2339A and 2333; (4) provision of material support and resources to a designated foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B(a)(1) and 2333(a); (5) negligent infliction of emotional distress; (6) concealment of material support and resources to a foreign terrorist organization, in violation of 18 U.S.C. §§ 2339C(c) and 2333(a); (7) provision of funds, goods, and services to or for the benefit of specially designated global terrorists, in violation of Executive Order No. 13224, 31 C.F.R. Part 594, 50 U.S.C. § 1705, and 18 U.S.C. § 2333(a); and (8) wrongful death.[65] The defendants moved to dismiss all claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[66] The plaintiffs did not oppose the motion to dismiss claim two (the § 2333(d) claim for conspiracy to aid and abet international terrorism), claim three (the § 2339A claim for provision of material support), and claim six (the § 2339C(c) claim for concealment of material support) and conceded at the December 6, 2018 hearing that they would not pursue these claims.[67] The claims at issue thus are claims one, four, five, seven, and eight.

**STANDARD OF REVIEW**

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of what the claims are and the grounds upon which they rest. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a claim for relief above the speculative level. . . ." *Id.* (internal citations omitted).

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, which when accepted as true, "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

---

[65] *Id.* at 119–127 (¶¶ 587–635).

[66] Mot. – ECF No. 53.

[67] Opp. – ECF No. 59; Reply – ECF No. 61 at 9, 12.

ORDER – No. 17-cv-06894-LB; 18-CV-00543-LB          10

556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

If a court dismisses a complaint, it must give leave to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). A court need not grant leave to amend if the court determines that giving leave to amend would be futile. *See e.g., Beckman v. Match.com, LLC,* 668 Fed. Appx. 759, 759 (9th Cir. 2016) (district court did not abuse its discretion when it determined that amendment of claims [barred by § 230 of the Communications Decency Act] would be futile) (citing *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991)); *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987).

## ANALYSIS

The defendants move to dismiss the complaints on the grounds that (1) the plaintiffs do not plausibly allege that the defendants are directly responsible for an act of international terrorism and (2) the plaintiffs do not plausibly allege that ISIS was responsible for the San Bernardino attack and thus do not plausibly claim that the defendants are secondarily liable.[68] The court grants the motion to dismiss on both grounds.

### 1. Direct Liability

The plaintiffs' claims for direct liability are **claim four**, provision of material support and resources to a designated foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B(a)(1)

---

[68] Mot. – ECF No. 53 at 13–26.

and 2333(a)), and **claim seven**, provision of funds, goods, and services to or for the benefit of specially designated global terrorists, in violation of Executive Order No. 13224, 31 C.F.R. Part 594, 50 U.S.C. § 1705, and 18 U.S.C. § 2333(a).[69] The defendants contend that that the plaintiffs did not plausibly allege proximate cause, namely, a direct relationship between the defendants' wrongdoing and the San Bernardino attack.[70] The court dismisses claims four and seven because the plaintiffs did not plausibly plead proximate cause.

The ATA's direct-liability provision is as follows.

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a). In *Fields v. Twitter, Inc.*, the Ninth Circuit addressed what is meant by the phrase "by reason of an act of international terrorism." 881 F.3d 739, 744 (2018). It held that the "by reason of" language requires a showing of proximate causation. *Id.*

In *Fields*, ISIS claimed credit for killing two government contractors in Jordan. 881 F.3d at 741. (The contractors were shot by Abu Zaid, a Jordanian police officer. *Id.*) Their family members sued Twitter under § 2333(a), alleging that they were injured "by reason of" Twitter's knowing and reckless provision of material support to ISIS in the form of Twitter accounts and direct-messaging services, thereby proximately causing the contractors' deaths. *Id.* at 742. More

---

[69] Both claims are predicated on the ATA, 18 U.S.C. § 2333(a). Claim four also is predicated on 18 U.S.C. §§ 2339B(a)(1) and claim seven also is predicated on 50 U.S.C. § 1705. The parties agree that the § 1705 claim is similar to the § 2339B(a)(1) claim. Mot. – ECF No. 53 at 20; Opp. – ECF No. 59 at 15. The court thus "focuses on the ATA claims." *Cf. Taamneh v. Twitter Inc.*, – F. Supp. 3d –, No. 17-cv-04107-EMC, 2018 WL 5729232, at *6 (N.D. Cal Oct. 29, 2018) (employing this approach).

[70] Mot. – ECF No. 53 at 14–18. The defendants also argued that the San Bernardino attack was not an act of international terrorism. *Id.* at 13–14. Under 18 U.S.C. § 2331(1)(C), to qualify as international terrorism, an attack must — among other elements — occur "primarily outside the United States" or "transcend national boundaries." In a case with similar facts, the Eastern District of Michigan held that a mass shooting at a nightclub in Orlando, Florida was not an act of international terrorism, despite allegations that the shooter was radicalized by social media. *Crosby v. Twitter, Inc.*, 303 F. Supp. 564, 572–73 (E.D. Mich. Mar. 30, 2018), *appeal docketed*, No. 18-1426 (6th Cir. Apr. 13, 2018). Because the proximate-cause issue is dispositive, the court does not reach this issue. *Cf. Taamneh*, 2018 WL 5729232, at *6 (reached only the proximate-cause issue).

specifically, they alleged that ISIS (1) used Twitter's direct-messaging feature to communicate with potential recruits and "for fundraising and operational purposes," (2) used Twitter to recruit more publicly by posting "instructional guidelines and promotional videos," and (3) used Twitter to fundraise and spread propaganda and fear by posting graphic media. *Id.* at 742–43.

The Ninth Circuit affirmed the district court's dismissal of the direct-liability claims on the ground that the plaintiffs did not plausibly plead proximate cause. *Id.* at 744. It held that "to satisfy the ATA's 'by reason of' requirement, a plaintiff must show at least some direct relationship between the injuries that he or she suffered and the defendant's acts." *Id.* In reaching this conclusion, the court rejected the plaintiffs' contention that proximate cause is established "when a defendant's acts were a substantial factor in the sequence of responsible causation, and the injury at issue was reasonably foreseeable or anticipated as a natural consequence." *Id.* (internal quotations omitted); *see id.* at 749 (foreseeability can be relevant to the proximate-cause analysis, but under the ATA, a direct relationship is required). The court held that because the plaintiffs pleaded "no facts indicating that Abu Zaid's attack was in any way impacted, helped by, or the result of ISIS's presence on the social network," the plaintiffs failed to state a claim. *Id.* at 750.

The plaintiffs' direct-liability claims fail under *Fields*. The alleged links between ISIS and the shooting are ISIS's allegedly claiming credit after the fact, Malik's pledging allegiance to ISIS leader Abu Bakr al-Baghdadi, and Farook's and Malik's alleged radicalization after they were exposed to ISIS content on the defendants' online platforms. These allegations do not establish a direct relationship between the defendants' acts and the plaintiffs' injuries. *Id.* ISIS's alleged claiming of responsibility after the fact does not establish the direct relationship. *Cf. id.* at 741, 749–50 (ISIS also claimed responsibility); *see also Copeland v. Twitter, Inc.*, No. 17-cv-05851-WHO, 2018 WL 6251384, at *1–3 (N.D. Cal. Nov. 19, 2018) *appeal docketed*, No. 18-17327 (9th Cir. Dec. 6, 2018). Malik's pledging allegiance to ISIS also does not plausibly plead a direct relationship between these defendants and the plaintiffs' injuries. *See Fields*, 881 F.3d. at 744. Finally, the alleged radicalization by exposure to online content does not establish proximate cause. "Nothing in § 2333 indicates that Congress intended to provide a remedy to every person reached by these ripples [of harm that flow from the defendants' provision of communication

services]; instead, Congress intentionally used the 'by reason of' language to limit recovery." *Id.* at 749 (reaching this conclusion in part because "we are troubled by the seemingly boundless litigation risk that would be posed by extending the ATA's bounds as far as foreseeability may reach.").

The plaintiffs suggest that this last allegation — the radicalization by exposure to online content — distinguishes this case from *Fields*.[71] It does not. *Fields* is explicit on the issue: the possible ripples of harm are not the direct relationship between the social-media platforms and the injuries that is required for proximate cause. *Id.* A contrary conclusion poses boundless litigation risk and is not tenable given how interconnected communication services are with modern economic and social life. *Id.* In sum, the alleged radicalization through exposure to online content does not establish the necessary direct relationship between the defendants' conduct and the attacks on the victims. *Id.*

Moreover, the plaintiffs do not plead any facts that show any direct recruitment of the attackers by ISIS through the platforms or their radicalization by actual exposure to ISIS content on the defendants' sites. Absent concrete allegations such as these, other courts have held post-*Fields* that plaintiffs do not plausibly plead a direct ATA claim by alleging only that the social-media platforms radicalize users. *See Copeland*, 2018 WL 6251384, at *1–2, *6 (generalized allegations that an alleged ISIS soldier was radicalized because of ISIS content on social-media sites are no different than the allegations rejected in *Fields*); *Taamneh v. Twitter Inc.*, – F. Supp. 3d –, No. 17-cv-04107-EMC, 2018 WL 5729232, at *7–8 (N.D. Cal Oct. 29, 2018) (conclusory allegations that shooter was radicalized through social media are insufficient to support a plausible claim of contention of probable cause, especially given that there were no allegations that the shooter saw specific content on social media related to ISIS). The court follows these cases as persuasive. Cases that pre-date *Fields* also support this approach. *See, e.g., Pennie v. Twitter*, 281 F. Supp. 3d 874, 891 n.8 (N.D. Cal. 2017) ("Absent any factual allegations regarding the Hamas postings that [the attacker] allegedly viewed and their relationship to the shooting, the assertions here that

---

[71] Opp. – ECF No. 59 at 19.

Hamas radicalized [the attacker] are both too conclusory to be taken as true and too vague to establish proximate cause.").

Like the plaintiffs in *Fields*, the plaintiffs here "have not pleaded that [the defendants'] provision of communication equipment to ISIS . . . had any direct relationship with the injuries that [the plaintiffs] suffered." 881 F.3d at 749. There is no connection between the provision of their online platforms and the plaintiffs' injuries. *Id.* at 750. In short, there is no proximate cause.

### 2. Indirect Liability

The plaintiffs' remaining claim for indirect lability is **claim one**, aiding and abetting international terrorism, in violation of 18 U.S.C. § 2333(a) and (d). The defendants contend that they have no liability under § 2333(d) because the plaintiffs do not plausibly plead that ISIS committed, planned, or authorized the attacks or that the defendants aided and abetted the San Bernardino shooting.[72] The court grants the motion to dismiss claim one on both grounds.

The Justice Against Sponsors of Terrorism Act ("JASTA") amended the ATA to provide for indirect liability:

> In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization. . ., liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

18 U.S.C. § 2333(d)(2).

First, the plaintiffs do not plausibly plead that ISIS "committed, planned, or authorized" the San Bernardino attack. *See Copeland*, 2018 WL 6251384 at *6–7. The three ties to ISIS (as discussed above) are ISIS's allegedly claiming credit after the fact, Malik's pledging allegiance to ISIS leader Abu Bakr al-Baghdadi, and Farook's and Malik's alleged radicalization after they were exposed to ISIS content on the defendants' online platforms. *Copeland* also involved ISIS's claiming credit after the fact, and that did not establish direct or indirect liability. *Id.* at *6–7. As

---

[72] Mot. – ECF No. 53 at 22–26.

discussed above, Malik's pledge does not establish ISIS's role. And "[a]bsent evidence that ISIS itself planned or carried out the attack, facts that ISIS sought to 'generally radicalize' individuals and promoted terrorist[] attacks . . . are insufficient" to plausibly plead claims for indirect liability under § 2333(d)(2). *Id.* at \*7 (citing *Crosby,* 303 F. Supp. 3d at 564). In sum, the plaintiffs do not plausibly plead that ISIS "committed, planned, or authorized" the San Bernardino attacks. 18 U.S.C. § 2333(d)(2).

Second, the plaintiffs do not plausibly plead that the defendants aided and abetted the San Bernardino shooters. "Aiding-abetting [under the ATA] includes the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." *Copeland*, 2018 WL 625184, at \*7 (quoting *Halberstam v. Welch*, 705 F.3d 472, 477 (D.C. Cir. 1983)). Here — as in *Copeland* and *Taamneh* — there are allegations only that the defendants were generally aware that ISIS used their services. There are no allegations that they intended to further ISIS's activities or "at least w[ere] 'generally aware' that, through [their] actions, the defendant[s] 'w[ere] thereby playing a 'role' in the [organization's] violent or life-endangering activities." *Id.* (citing and quoting *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2nd Cir. 2018)); *Taamneh*, 2018 WL 5729232, at \*11 (citing and quoting *Linde*, 882 F.3d at 329). There are no allegations that the defendants played a role in any particular terrorist activity or provided substantial assistance. *Cf. Copeland*, 2018 WL 625184, at \*7; *Taamneh*, 2018 WL 5729232, at \*12.

The court grants the motion to dismiss claim one.

### 3. State-Law Claims

The plaintiffs' state-law claims are **claim six**, negligent infliction of emotional distress, and **claim eight**, wrongful death. The plaintiffs' failure to plausibly plead proximate cause for the federal claims defeats their state-law claims too, even considering that the standard for proximate

cause is more lenient under state law. *Taamneh*, 2018 WL 5729232, at *13; *accord Copeland*, 2018 WL 6251384 at *8.

**CONCLUSION**

The court grants the defendants' motion to dismiss and dismisses the complaint. Because other courts have consistently rejected materially similar claims, the dismissal is without leave to amend and with prejudice. *Copeland*, 2018 WL 6251384 at *8; *Taamneh*, 2018 WL 5729232, at *13.[73]

**IT IS SO ORDERED.**

Dated: December 31, 2018

LAUREL BEELER
United States Magistrate Judge

---

[73] The defendants also argued that they are immune from liability under the Communications Decency Act , 47 U.S.C. § 230(c)(1), which immunizes "Interactive Service Providers" (such as the defendants) for claims based on third-party content. Mot. – ECF No. 53 at 26–31. The *Fields* court declined to reach the issue of whether § 230 protects social-media providers like the defendants here from liability. 881 F.3d at 750. The *Copeland* and *Taamneh* courts did not reach the issue either. *Copeland*, 2018 WL 6251384; *Taamneh*, 2018 WL 5729232. Under the circumstances, and having already written extensively on the issue, *see Dyroff v. Ultimate Software Group, Inc.*, No. 17-cv-05359-LB, 2017 WL 5665670 (N.D. Cal. Nov. 26, 2017), the court does not address the issue.